COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | § | |
|---|---|---|
| IHR SECURITY, LLC, | | No. 08-12-00227-CV |
| | § | |
| Appellant, | | Appeal from |
| | § | |
| v. | | 14th District Court |
| | § | |
| INNOVATIVE BUSINESS | | of Dallas County, Texas |
| SOFTWARE, INC., | § | |
| | | (TC # DC-11-14117-A) |
| Appellee. | § | |

## **O P I N I O N**

I.H.R. Security, L.L.C. (IHR) appeals from a summary judgment in favor of Innovative Business Software, Inc. (IBS).[1] For the reasons that follow, we reverse in part and affirm in part.

### **FACTUAL SUMMARY**

IHR installs alarms and provides alarm monitoring services for its customers. IBS is in the business of providing software and software-related goods and services to its clients. In 2010, IHR was using alarm monitoring software, but it wished to obtain software which would integrate the accounting and service call data into the monitoring software package. Consequently, IHR contacted IBS about a software package to perform these functions. IHR and

---

[1] The Texas Supreme Court entered a docket equalization order transferring the appeal from the Fifth Court of Appeals to the Eighth Court of Appeals. *See* TEX.GOV'T CODE ANN. § 73.001 (West 2013). We are unaware of any conflict between precedent of the Fifth Court of Appeals and that of this Court on any issue. *See* TEX.R.APP.P. 41.3. We have, nevertheless, reviewed case law of the Fifth Court of Appeals in addressing the issues presented on appeal.

IBS entered into two agreements: a Data Duplication Agreement and a Software License Agreement. In accordance with the terms of the License Agreement, IHR paid IBS the sum of $20,000 for installation of the software and to have its existing accounting data imported. According to IHR, the accounting software did not function as promised; consequently, it did not have IBS import the data into the alarm monitoring software. IHR subsequently refused to pay the invoices submitted by IBS for goods and services performed under both the License Agreement and the Data Duplication Agreement.

IBS filed suit against IHR for breach of both agreements. In its first amended petition, IBS alleged it had performed all of its obligations under both agreements and it sought to recover the unpaid balances on the invoices submitted pursuant to the License Agreement and the Data Duplication Agreement in the total amount of $52,437.17. IBS also sought to recover attorneys' fees. IHR did not raise any counterclaims and instead asserted in its answer that its liability was capped at $5,000 under a limitation of liability clause in the License Agreement.

IHR filed a motion for partial summary judgment on its limitation of liability affirmative defense. At about the same time, IBS moved for summary judgment on its breach of contract claims based on the License Agreement and the Data Duplication Agreement. IBS sought to recover the total sum of the unpaid invoices, $52,437.17. Following a hearing, the trial court granted IBS's motion for summary judgment and denied IHR's motion. In its final judgment, the trial court awarded IBS the sum of $52,437.17 plus accrued interest in the amount of $4,399.86, and post-judgment interest. The court also awarded attorney's fees to IBS in the amount of $10,000 plus conditional awards of attorney's fees in the event of an unsuccessful appeal by IHR to the court of appeals or the Texas Supreme Court.

**THE DATA DUPLICATION AGREEMENT**

IHR has not raised any issues on appeal related to the portion of the judgment awarding IBS the amount of the unpaid balances owing on the invoices related to the Data Duplication Agreement. Consequently, we affirm that portion of the judgment.

**IBS'S MOTION FOR SUMMARY JUDGMENT**

IHR makes four distinct arguments in Issue One, so we will refer to the four arguments as Sub-parts A, B, C, and D of Issue One. In Sub-part A, IHR argues that the trial court erred by granting IBS's motion for summary judgment on the breach of contract claim and awarding damages in the amount of $52,437.17 because IHR's liability is limited to $5,000 under the contract. Additionally, it contends in Sub-parts B, C, and D that there are fact issues precluding summary judgment.

*The Standard of Review*

The standard of review for traditional summary judgment under TEX.R.CIV.P. 166a(c) is well established. *Nixon v. Mr. Property Management Company, Inc*., 690 S.W.2d 546, 548 (Tex. 1985). The moving party carries the burden of showing there is no genuine issue of material fact and it is entitled to judgment as a matter of law. *Diversicare General Partner, Inc. v. Rubio*, 185 S.W.3d 842, 846 (Tex. 2005); *Browning v. Prostok*, 165 S.W.3d 336, 344 (Tex. 2005). Evidence favorable to the non-movant will be taken as true in deciding whether there is a disputed issue of material fact. *Fort Worth Osteopathic Hospital, Inc. v. Reese*, 148 S.W.3d 94, 99 (Tex. 2004); *Tranter v. Duemling*, 129 S.W.3d 257, 260 (Tex.App.--El Paso 2004, no pet.). All reasonable inferences, including any doubts, must be resolved in favor of the non-movant. *Fort Worth Osteopathic Hospital*, 148 S.W.3d at 99. Once the movant establishes its right to summary judgment, the burden then shifts to the non-movant to present evidence which raises a genuine

issue of material fact, thereby precluding summary judgment. *See City of Houston v. Clear Creek Basin Authority*, 589 S.W.2d 671, 678 (Tex. 1979). We review the grant or denial of a traditional motion for summary judgment *de novo*. *Valence Operating Company v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *Texas Integrated Conveyor Systems, Inc. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348, 365 (Tex.App.--Dallas 2009, pet. denied).

A plaintiff is entitled to summary judgment on a cause of action if it conclusively proves all essential elements of the claim. *MMP, Ltd. v. Jones*, 710 S.W.2d 59, 60 (Tex. 1986); *see* TEX.R.CIV.P. 166a(a), (c). To be entitled to summary judgment on its breach of contract claims, IBS was required to conclusively establish (1) a valid contract existed between the parties, (2) IBS performed or tendered performance, (3) IHR breached the contract, and (4) IBS was damaged as a result of that breach. *See Gold's Gym Franchising LLC v. Brewer*, 400 S.W.3d 156, 162 (Tex.App.--Dallas 2013, no pet.).

*The License Agreement -- Limitation of Liability Clause*

IHR first argues in Sub-part A of Issue One that its liability is capped at $5,000 pursuant to the limitation of liability clause in the License Agreement. When construing a contract, our primary goal is to determine the parties' intent as expressed in the terms of the contract. *Chrysler Insurance Company v. Greenspoint Dodge of Houston, Inc.*, 297 S.W.3d 248, 252 (Tex. 2009); *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983); *Bob Montgomery Chevrolet, Inc. v. Dent Zone Companies*, 409 S.W.3d 181, 189 (Tex.App.--Dallas 2013, no pet.). To achieve this goal, we examine the entire document and consider each part with every other part so that the effect and meaning of one part on any other part may be determined. *Heritage Resources, Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996). We also examine the entire agreement in an effort to harmonize and give effect to all of the provisions of the contract so that none will be

rendered meaningless. *MCI Telecommunications Corporation v. Texas Utilities Electric Co*., 995 S.W.2d 647, 652 (Tex. 1999). We presume that the parties to a contract intend every clause to have some effect. *Heritage Resources*, 939 S.W.2d at 121. Contract language that can be given a certain or definite meaning is not ambiguous and is construed as a matter of law. *Chrysler Insurance*, 297 S.W.3d at 252; *Coker*, 650 S.W.2d at 393. If the contract is subject to two or more reasonable interpretations after applying the pertinent rules of construction, then the contract is ambiguous, and it creates a fact issue concerning the parties' intent. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003); *Daftary v. Prestonwood Market Square, Ltd*., 404 S.W.3d 807, 813 (Tex.App.--Dallas 2013, no pet.). Whether an agreement is ambiguous is a question of law for the court to decide by looking at the agreement as a whole in light of the circumstances present when the agreement was entered. *Daftary*, 404 S.W.3d at 813, *citing Coker*, 650 S.W.2d at 394.

The License Agreement is an extensive 30-page contract. There are several provisions in the License Agreement regarding payment for goods and services. Paragraph 7 of the License Agreement covers several types of fees, including the basic charge of $20,000 for 10,000 alarm accounts, enhancement charges, licensee initial enhancements, maintenance fees, conversion costs, project expenses, additional alarm account fees, language translation fees, additional module fees, and the fee for software installation and system set-up. Paragraph 8 addresses warranties by IBS, software warranties, personnel warranties, manufacturer warranties, and warranties by IHR. The limitation of liability provision is found in Paragraph 8.6 and it provides as follows:

> NEITHER IBS NOR LICENSEE SHALL BE LIABLE FOR ANY INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES, LOST PROFITS OR COST OF PROCUREMENT OF SUBSTITUTE GOODS TECHNOLOGY OR SERVICES, HOWEVER DESIGNATED. THE WARRANTIES SET FORTH IN THIS

PARAGRAPH 8 HEREIN ARE THE ONLY WARRANTIES MADE BY IBS. IBS DOES NOT WARRANT THAT THE PRODUCTS WILL MEET LICENSEE'S NEEDS OR BE FREE FROM ERRORS, OR THAT THE OPERATION OF THE SOFTWARE WILL BE UNINTERRUPTED. IBS DOES NOT REPRESENT THAT THE SYSTEM OR THE LICENSED SOFTWARE MAY NOT BE COMPRISED [sic] OR CIRCUMVENTED OR WILL PREVENT ANY PERSONAL INJURY OR PROPERTY LOSS BY BURGLARY, ROBBERY, FIRE OR OTHERWISE, OR THAT THE SYSTEM WILL IN ALL CASES PROVIDE ADEQUATE WARNING OR PROTECTION. LICENSEE UNDERSTANDS THAT A PROPERLY INSTALLED AND MAINTAINED ALARM OR ALARM MONITORING SYSTEM MAY ONLY REDUCE THE RISK OF BURGLARY, ROBBERY OR FIRE WITHOUT WARNING, BUT IT IS NOT INSURANCE OR ANY GUARANTEE THAT SUCH WILL NOT OCCUR. IBS SHALL HAVE NO LIABILITY WITH RESPECT TO ITS OBLIGATIONS UNDER THIS AGREEMENT OR OTHERWISE WHETHER BASED IN CONTRACT, TORT, OR UPON ANY OTHER LEGAL THEORY FOR CONSEQUENTIAL, EXEMPLARY, OR INCIDENTAL DAMAGES INCLUDING, BUT NOT LIMITED TO, LIABILITY FOR PERSONAL INJURY, PROPERTY DAMAGE, ECONOMIC LOSS, OR CLAIMS OF THIRD PARTIES, INCLUDING CUSTOMERS OF THE LICENSEE, BASED ON A CLAIM THAT THE SOFTWARE FAILED TO GIVE WARNING EVEN IF IT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. NOTWITHSTANDING ANYTHING TO THE CONTRARY, THE TOTAL DOLLAR LIABILITY OF EITHER PARTY UNDER THIS AGREEMENT OR OTHERWISE SHALL BE LIMITED TO US $5,000.

IHR interprets the last sentence of Paragraph 8.6 to mean that its liability under the entire License Agreement, including its obligation to pay for the goods and services provided by IHR, is capped at a maximum of $5,000. Citing *Helmerich & Payne International Drilling Co. v. Swift Energy Co.,* 180 S.W.3d 635, 643 (Tex.App.--Houston [14th Dist.] 2005, no pet.), IHR maintains that the language in the limitation of liability clause, "NOTWITHSTANDING ANYTHING TO THE CONTRARY", indicates that the parties intended for the clause to take precedence over any other conflicting term in the License Agreement. In *Helmerich*, the Fourteenth Court of Appeals stated that when parties use the clause "notwithstanding anything to the contrary contained herein" in a paragraph of their contract, they contemplate the possibility that other parts of their contract may conflict with that paragraph, and they agree that this

paragraph must be given effect regardless of any contrary provisions of the contract). *Helmerich*, 180 S.W.3d at 643. Other cases cited in *Helmerich* address the same rule: *Gulf Oil Corp. v. Southland Royalty Co.*, 496 S.W.2d 547, 551 (Tex. 1973)(addressing section of lease containing "anything in this lease to the contrary notwithstanding" clause); *Ridgewood Timber, Inc. v. GMAC Commercial Mort. Corp.*, No. 05-99-00054-CV, 1999 WL 1140821, at *4 (Tex.App.--Dallas, Dec.14, 1999, no pet.)(not designated for publication)(finding that the conflict between two provisions of a contract could be reconciled, but even if they could not be reconciled, the one with the "notwithstanding anything to the contrary contained herein" clause would take precedence); *N.M. Uranium, Inc. v. Moser,* 587 S.W.2d 809, 814-15 (Tex.Civ.App.-- Corpus Christi 1979, writ ref'd n.r.e.)(stating that "[t]he expression 'anything in this lease to the contrary notwithstanding,' when used in the final section of a written contract, has priority over any contrary provision of the contract directed to the same question.").

The rule relied on by IHR does not apply unless there is an irreconcilable conflict between Paragraph 8.6 and other portions of the contract. IHR's construction is based on reading the last sentence of the paragraph out of context and in isolation from the rest of Paragraph 8.6. When Paragraph 8.6 is considered as a whole and in relation to the rest of the Agreement, it is apparent that the intent of the parties was to limit their liability for damages caused by the improper functioning or failure of the software. Paragraph 8.6 does not purport to limit IHR's liability in the event it breaches the License Agreement by refusing to pay for goods and services provided by IBS. None of the other provisions in the License Agreement conflicts with Paragraph 8.6, so the "notwithstanding anything to the contrary" language does not operate to nullify other provisions in the Agreement. To construe Paragraph 8.6 in the manner asserted by IHR would render meaningless all of the other provisions regarding fees and payment by IHR

for goods and services rendered by IBS. We conclude that IHR's interpretation of the License Agreement is unreasonable and does not render the Agreement ambiguous. Sub-part A of Issue One is overruled.

*Issues of Fact*

In Sub-parts B and C of Issue One, IHR argues that it raised a material fact issue regarding the validity of IBS's invoices. IBS's summary judgment evidence related to the amount of damages included an account receivables ledger (Plaintiff's Exhibit C) and eleven invoices related to the accounts receivable found on Exhibit C (Plaintiff's Exhibits D-1 through D-11). The account receivables found on Exhibit C are broken into two parts, one related to the data duplication project and the other related to the License Agreement. The data duplication portion of the accounts receivable ledger lists five invoices (Invoices D-1 through D-5) in the total amount of $4,930.83. The License Agreement portion of the accounts receivable ledger lists six invoices (Invoices D-6 through D-11) in the total amount of $47,506.34. Invoice D-10 is for the total amount of $17,613.14 and states on its face that it is for "Initial System Set-up and Software Installation Per License Agreement," but the invoice also reflects it is for "Basic Monitoring Conversion". Invoice D-11 is an invoice in the amount of $19,420.05 for "Conversion Per License Agreement".

Paragraph 7.5 of the License Agreement provides that: "Initial Conversion Costs shall be capped at $20,700." IHR contends that both Invoices D-10 and D-11 are for conversion costs and the total amount of $37,033.19 exceeds the cap of $20,700. IBS responds that Exhibit C shows the amount billed on Invoice D-10 is for software set-up. IBS is correct, but Invoice D-10 plainly states on its face the amount billed is for "Basic Monitoring Conversion". This conflict in the summary judgment evidence creates a fact issue regarding whether the amount billed on

Invoice D-10 is for basic monitoring conversion or software set-up. Consequently, we sustain Sub-part B of Issue One.

In Sub-part C of Issue One, IHR asserts that a fact issue exists with respect to the portion of the damages based on Plaintiff's Exhibit D-7 (Invoice D-7). This invoice is in the amount of $3,247.50 and is for "Maintenance Fees Per License Agreement." Paragraph 7.4 provides that IHR is required to pay maintenance fees for every month after IHR "is live and using any portion of the Software . . . ." IHR relied on the affidavit of its president, Kenno Armstrong, to establish that the accounting software never functioned and it had not used any portion of the software. Armstrong averred that the accounting data was imported first but the accounting software never functioned. Because the accounting software never functioned, IHR did not have its data imported into the monitoring software function. Armstrong further stated that:

> [T]he software never delivered as promised and could never provide any meaningful accounting functions sought by IHR as promised by IBS. In essence, the software only did what IHR already had, which was alarm monitoring software without meaningful accounting functions. Therefore, IHR bought yet another accounting software at its own expense and replaced the IBS software with new accounting software. IHR never used IBS software for alarm monitoring and to this day still uses the same alarm monitoring software it used prior to 2010. IHR is no longer using any portion of the IBS software. Accordingly, IHR has received no benefit from the IBS software and has paid IBS $20,000.00 for the same. As a result, IHR also refused to pay IBS any additional sums IBS claimed was due under the contract.

Under the summary judgment evidence standard, we must take the evidence favorable to IHR as true. We conclude that there is a material fact issue with respect to whether IHR was obligated to pay the maintenance fees under the License Agreement. Sub-part C of Issue One is sustained.

In Sub-part D of Issue One, IHR maintains that Armstrong's affidavit creates a material issue of fact regarding IBS's performance of the License Agreement. IBS presented summary judgment evidence to establish that it performed its obligations under the License Agreement as

related to the eleven invoices which had not been paid by IHR. Armstrong averred generally that the accounting function of the software did not work properly so IHR never imported its data to be used in connection with the alarm monitoring function. This evidence does not raise a fact issue regarding whether IBS performed its obligations under the License Agreement with respect to each of the eleven invoices. Accordingly, we overrule Sub-part D of Issue One.

## IHR'S MOTION FOR SUMMARY JUDGMENT

In its second issue, IHR contends that the trial court erred by denying IHR's motion for summary judgment based on the limitation of liability clause. A defendant is entitled to summary judgment if the defendant conclusively establishes all elements of an affirmative defense. *D. Houston, Inc. v. Love*, 92 S.W.3d 450, 454 (Tex. 2002); *Randall's Food Markets, Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex. 1995). The limitation of liability provision in the contract constitutes an affirmative defense under TEX.R.CIV.P. 94 because IHR is attempting to avoid actual damages by arguing that its liability is predetermined and limited. *See Regency Advantage Limited Partnership v. Bingo Idea–Watauga, Inc.*, 928 S.W.2d 56, 63 (Tex.App.--Fort Worth 1995), *aff'd in part and rev'd in part on other grounds*, 936 S.W.2d 275 (Tex. 1996); *Borders v. KRLB, Inc.*, 727 S.W.2d 357, 359-60 (Tex.App.--Amarillo 1987, writ ref'd n.r.e.).

We have already determined that IHR's interpretation of the limitation of liability clause is unreasonable and the provision does not operate to limit IHR's liability in the event it breached the License Agreement. Issue Two is overruled.

Having sustained Sub-parts B and C of Issue One, we reverse that portion of the trial court's judgment awarding IBS damages in the amount of $17,613.14 (Invoice D-10) and in the amount of $3,247.50 (Invoice D-7), and we further reverse that portion of the judgment awarding IBS accrued interest in the total amount of $4,399.86. We remand the cause to the trial court for

trial on IBS's breach of the License Agreement claim as it applies to Invoices D-7 and D-10, and to re-calculate the amount of accrued interest which should be awarded in the final judgment. Having overruled Sub-part A of Issue One, Sub-part D of Issue One, and Issue Two, we affirm the remainder of the final judgment.

March 19, 2014

ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rivera, and Rodriguez, JJ.